**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE VIA RENEWABLES, INC. MERGER LITIGATION | ) ) | Consolidated C.A. No. 2024-0762-KSJM |

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS**[1]

1. The stockholder plaintiff challenges the acquisition of Via Renewables, Inc. ("Via" or the "Company") by its founder and controller, William K. Maxwell III, claiming that Maxwell and Via's board of directors (the "Board") breached their fiduciary duties.

2. By way of background, retail energy services company Via entered 2021 having had its "strongest year yet," but hardships—including Russia's invasion of Ukraine in 2022—caused Via's stock price to decline.[2] Via's reverse stock split and the Board's decision to suspend dividends in 2023 further affected the stock. Before these events, Via's stock traded at around $60 per share.[3] After these events, Via's stock traded at around $8.46 per share. In September 2023, Maxwell submitted a proposal to take Via private for $10.50 per share.[4]

3. The September proposal did not include *MFW* conditions. In response to the September proposal, the Board formed a special committee comprising directors Amanda Bush, Stephen Kennedy, and Kenneth Hartwick (the "Special

---

[1] The facts are drawn from the Verified Amended Class Action Complaint (the "Amended Complaint") and documents it incorporates by reference. Cons. C.A. No. 2024-0762-KSJM, Docket ("Dkt.") 24 (Am. Compl.).

[2] *Id.* ¶ 5.

[3] *Id.* ¶ 63.

[4] *Id.* ¶ 79.

Committee" or "Committee"). The Committee retained advisors. Through their advisors, the Committee repeatedly requested *MFW* protections. The advisors ran an analysis of minority voting trends to convince Maxwell to agree to those protections. Rather than agree, Maxwell withdrew his offer and shored up financing.

4. Although there was no offer on the table, Maxwell and the Special Committee negotiated over a possible merger. There was continued "disagreement," according to the Amended Complaint, over the "majority of the minority concept."[5] At one point, Maxwell noted this disagreement and told the Committee's counsel that he "intend[ed] to bring [it] up at" a Board meeting.[6] In response, Committee member Kennedy called Maxwell. Kennedy had known Maxwell for 33 years. Maxwell did not bring up the disagreement at any Board meeting.

5. On November 15, Maxwell submitted another proposal to acquire Via (the "Merger") for $9 per share. The proposal equivocated on the *MFW* conditions, stating that Maxwell "anticipate[s]" that the Board would form a special committee and "intend[s]" to condition any merger on a successful majority-of-the-minority vote. [7] Given the language of the proposal concerning *MFW* protections, the Committee sought clarification of Maxwell's intent. The Committee's counsel called Maxwell the day after receiving the November proposal. After the call, the Committee's counsel wrote to Maxwell's team asking Maxwell to confirm the

---

[5] *Id.* ¶ 138.

[6] *Id.*

[7] *Id.* ¶ 145.

2

Committee's understanding that Maxwell intended to condition the Merger on *MFW* protections. Maxwell's team neither confirmed nor denied.

6. Maxwell's team sent a draft Agreement and Plan of Merger (the "Merger Agreement") to the Committee on November 28. It did not condition the Merger on a majority-of-the-minority vote. And on November 29, the Committee's counsel referred to the majority-of-the-minority condition as a "key concept[]" that still needed to be addressed.[8] The Committee sent a draft Merger Agreement back to Maxwell on December 7, which proposed a transaction at $12.65 per share and included a majority-of-the-minority condition. On December 15, Maxwell rejected the Committee's counteroffer. But he indicated his assent to the majority-of-the-minority condition by sending the Committee a revised draft Merger Agreement that included the condition. It is reasonably conceivable that Maxwell had not agreed to this condition before that time.

7. Between November 15, when Maxwell sent the $9-per-share offer, and December 15, when Maxwell formally assented to *MFW* conditions, Maxwell and the Committee negotiated the length of a go-shop period, as well as Maxwell's ability to use his Company stock as collateral to secure financing. The Committee also made a counterproposal of $12.65 per share after consulting its financial advisor. In fact, these negotiations all occurred prior to the Committee sending Maxwell the revised Merger Agreement with *MFW* conditions on December 7.

---

[8] *Id.* ¶ 164.

8. For the Committee's $12.65-per-share counteroffer, the Committee's financial advisor prepared initial financial analyses around December 7. The December 7 analyses, which were based on management's most recent projections prepared around October 31, suggested that Maxwell's initial $9-per-share offer was inadequate. And when Maxwell later increased his offer to $10.25 per share on December 25, the Committee's financial advisor stated that it could not deliver a fairness opinion on that price based on its December 7 analyses.

9. Yet by December 19—less than two months after management prepared the October 31 projections and twelve days after the Committee's financial advisor prepared its initial analyses—management was preparing new, lower projections. CFO Miguel Barajas led this effort. He presented the revised projections to the Committee on December 21. The minutes from Special Committee meetings do not reflect that the Committee approved the use of the revised projections at the December 21 meeting or at any other time. And four days later, the Committee's financial advisor used the December 7 analyses to review Maxwell's December 25 offer of $10.25 per share, concluding that it could not provide a fairness opinion.

10. On December 27, the Committee negotiated Maxwell up to $11 per share. That evening, Barajas formally directed the Committee's financial advisor to use the revised projections to prepare its fairness opinion. Two days later, the financial advisor delivered a fairness opinion based on the revised projections from Barajas. The Committee approved the Merger that day.

4

11. The Company filed a preliminary proxy statement soliciting support for the Merger on February 12, 2024.[9] The Company filed a final proxy statement on March 28 and issued supplemental disclosures on May 13 (together with the preliminary proxy statement, the "Proxy Statement").[10] The Proxy Statement made no mention of Maxwell's failure to fully self-disable until December 7 or the timing of the revised projections.[11] As a Company officer and signatory to the Merger Agreement, it is reasonably conceivable that Barajas participated in drafting and releasing the Proxy Statement.[12]

12. A stockholder meeting to vote on the Merger occurred on May 23, 2024. Via adjourned the meeting because it did not receive approval from enough minority stockholders. The meeting reconvened on June 7, and the Merger received 51% approval from the minority stockholders. The Merger closed in October 2024.

13. Plaintiff Michael Stutzman owned Via stock prior to the Merger. He filed this class action on October 14, 2024, alleging that Maxwell and entities he controls (the "Maxwell Defendants"), Barajas, and each director on the Special Committee breached their fiduciary duties in connection with the Merger.[13] On

---

[9] Am. Compl. ¶ 241.

[10] *Id.* ¶ 2.

[11] *Id.* ¶ 271; *see* Dkt. 32 ("Special Comm. & Barajas Opening Br."), Ex. 2 at 28–32; *id.*, Ex. 3 at 28–32.

[12] Am. Compl. ¶¶ 293–94.

[13] C.A. No. 2024-1053-KSJM, Dkt. 1.

October 25, the court consolidated Plaintiff's action with two other actions.[14] The Court appointed Stutzman lead plaintiff on November 22.[15]

14. Plaintiff filed the Amended Complaint on April 21, 2025.[16] In Count I, Plaintiff claims that the Maxwell Defendants breached their fiduciary duties owed as controllers.[17] In Count II, Plaintiff alleges that the Special Committee members breached their fiduciary duties owed as directors.[18] In Count III, Plaintiff claims that CFO Barajas breached his fiduciary duties by downwardly revising Company projections, authorizing their use without the Special Committee's approval, issuing a misleading Proxy Statement, and executing the Merger Agreement.[19]

15. On May 1, 2025, Maxwell Defendants, the Special Committee, and Barajas (together, "Defendants") moved to dismiss the Amended Complaint.[20] After parties completed briefing, the court held oral argument on May 12, 2026.[21]

16. Defendants moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6). The pleading standard under Rule 12(b)(6) is reasonable

---

[14] Dkt. 5.

[15] Cons. C.A. No. 2024-0762-KSJM, Dkt. 8.

[16] Dkt. 24.

[17] Am. Compl. ¶¶ 279–83.

[18] *Id.* ¶¶ 284–90.

[19] *Id.* ¶¶ 291–96.

[20] Dkts. 26, 27.

[21] Dkts. 46, 48, 58.

conceivability.[22] When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[23] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[24]

17.     Defendants move to dismiss Counts I and II under *MFW*.[25] Plaintiff argues that Delaware's most onerous standard of review—entire fairness—applies because the Merger was the result of a conflicted process due to Maxwell's involvement.[26] Defendants argue that the Merger complies with *MFW* thus restoring the business judgment standard.[27]

---

[22] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[23] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[24] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[25] On March 25, 2025, the General Assembly amended Section 144 of the DGCL, which "address[es], among other things, how directors and stockholders may approve corporate transactions in a way that limits the liability of controlling stockholders." *Rutledge v. Clearway Energy Gp. LLC*, ---A. 3d ---, 2026 WL 548504, at *3 (Del. Feb. 27, 2026); 85 Del. Laws ch. 6 § 1 (2025) (amending 8 *Del. C.* § 144). The amendments are effective as of February 17, 2025, and thus do not apply to the Merger, which closed in October 2024. 85 Del. Laws ch. 6 § 1 (2025).

[26] Dkt. 41 at 3.

[27] *See, e.g.*, Special Comm. & Barajas Opening Br. at 26–62.

18.     Under *MFW*, the court applies the business judgement rule if:

> (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority."[28]

"If a plaintiff [] can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist, that complaint would state a claim for relief that would entitle the plaintiff to proceed and conduct discovery."[29]

19.     Plaintiff advances many arguments for why Defendants did not comply with *MFW*. One suffices. For *MFW* to replicate arm's length negotiations, the conditions must be established up front.[30] This "require[s] the controller to self-disable before the start of substantive economic negotiations."[31] Establishing the dual protections of *MFW*'s first prong at the "germination" stage prevents the controller from using the conditions as a bargaining chip that can be "dangled in front of the Special Committee . . . as a substitution for a bare-knuckled contest over price."[32]

---

[28] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 645 (Del. 2014) ["*MFW*"].

[29] *Id.* (citations omitted).

[30] *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754, 762 (Del. 2018).

[31] *Id.* at 763.

[32] *Id.*

8

20.     By the time Maxwell acceded to including a version of the majority-of-the-minority condition on December 15, it is reasonably conceivable that the deal had moved passed germination and onto economic horse trading.  Maxwell had made two offers and lowered his price.  He submitted a bid in September 2023 at $10.50 per share.  He resurfaced on November 15 with a bid of $9 per share.  He equivocated on *MFW* in the November 15 offer.  The Committee sought clarification.  Maxwell did not respond.  Maxwell's team then sent the Committee a draft Merger Agreement without the condition on November 28.  The parties proceeded to negotiate the deal price, go-shop period, and Maxwell's ability to use his stock as collateral—all while the Committee's counsel considered the majority-of-the-minority condition a "key concept[]" that still needed to be addressed.[33]

21.     It is reasonably conceivable that Maxwell did not agree to the *MFW* conditions sufficiently early to warrant application of the business judgment standard at the pleading stage.  Count I states a claim.

22.     The Special Committee members' dismissal arguments rely exclusively on *MFW*.  They did not raise any separate defense under *Cornerstone*.[34]  Thus, for the reasons stated above, Count II states a claim.

---

[33] Am. Compl. ¶ 164.

[34] The Special Committee did not argue in briefing that they are protected by an exculpatory charter provision, or that Plaintiff must plead that they acted in bad faith under *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).  *See generally* Special Comm. & Barajas Opening Br.  They have thus waived those arguments.  *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003) (TABLE) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

23.     Barajas argues that Count III fails to state a claim against him as CFO. Plaintiff claims that Barajas acted disloyally and breached the duty of care in connection with the Merger. Barajas does not dispute that, as an officer, he faces liability for breaches of the duty of care.[35] To adequately allege a duty of care violation, a plaintiff must plead facts making it reasonably conceivable that Barajas acted grossly negligent or with "reckless indifference."[36] It is reasonably conceivable that Barajas acted at least with reckless indifference when he lowered projections and directed the financial advisor to use those projections, which favored Maxwell. Barajas prepared both the initial and the revised financial projections. He prepared the revised financial projections less than two weeks after the financial advisor doubted its ability to render a fairness opinion on those projections, and just days before Maxwell submitted an offer at $10.25 per share. Then, Barajas directed the Committee's financial advisor to use the revised projections for its fairness opinion, and it is reasonably conceivable that he did not have authorization from the Special Committee to do so. Count III states a claim.

---

[35] On July 27, 2022, the General Assembly amended Section 102 of the DGCL to allow for the exculpation of officers' liability. 83 Del. Laws ch. 377 § 1 (amending 8 *Del. C.* 102(b)(7)). The amendments became effective on August 1, 2022. In briefing, Barajas did not raise an exculpatory charter provision as a defense.

[36] *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *66 (Del. Ch. May 6, 2021) (quoting *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *5 (Del. Ch. Oct. 27, 2020)).

24.    Defendants' motions to dismiss are DENIED.

/s/ *Kathaleen St. J. McCormick*
Chancellor Kathaleen St. J. McCormick
Dated: August 12, 2026

11